Benzion KOENIG and William Steiner, Plaintiffs,

v.

E.M. BENSON, Jr., E. Richard DeRosa, Joseph M. Klein, Carl H. Linder, Louis F. Marioni, William A. Noll, Edward A. Smith, Maarten van Hengel, Ronald F. Walker, James C. Wilson, and American Financial Corporation, Defendants.

Stuart G. SOLOMON, Plaintiff,

v.

PACIFIC REINSURANCE MANAGEMENT CORP., American Financial Corp., Carl H. Linder, Ronald F. Walker, Michael A. Mulholland, Joseph M. Klein, Louis F. Marioni, Edward A. Smith, Edward M. Benson, Jr., E. Richard DeRosa, Maarten van Hengel, William A. Noll, and James C. Wilson, Defendants.

Nos. 86–CV–1391, 86–CV–4290.

United States District Court, E.D. New York.

Aug. 14, 1987.

Edwin J. Mills, Stull, Stull & Brody, New York City, for plaintiff Koenig.

Judith L. Spanier, Abbey & Ellis, New York City, for plaintiff Steiner.

Philip Jones, John Halebian, Wolf Popper Ross Wolf & Jones, New York City, for plaintiff Solomon.

Myron Kirschbaum, Kaye Scholer Fierman Hays & Handler, New York City, for all defendants except DeRosa and Marioni.

William J. Thomashower, Kaplan, Thomashower & Landau, New York City, for defendants DeRosa and Marioni.

BARTELS, District Judge.

Plaintiffs Benzion Koenig, William Steiner, and Stuart G. Solomon move this Court pursuant to F.R.Civ.P. 23 for certification of their respective actions as class actions.[1] All three plaintiffs allege violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b–5, based on omissions and misrepresentations of the financial condition of Mission Insurance Group ("Mission") allegedly contained in Mission's 1983 Annual Report and 1984 quarterly statements. Solomon also alleges three other claims arising out of the same facts, including a claim under § 20 of the 1934 Act, § 17(a)(2) and (3) of the Securities Act of 1933, 15 U.S.C. § 77q, and common law fraud. The proposed class in each plaintiff's complaint includes all purchasers of Mission common stock, excluding shares held by the defendants and their affiliates, from March 29, 1984, when the 1983 Annual Report (Form 10K) was filed with the SEC, through February 15, 1985, the date on which Mission reported a loss of approximately $198 Million in 1984.[2]

---

**1.** *Koenig and Steiner v. Benson* is the product of a prior consolidation by consent of two cases brought in this Court. *Solomon v. Pacific Reinsurance Mgt.* has not been consolidated with the other case, but states nearly identical claims against two additional defendants.

**2.** Plaintiff Benzion Koenig purchased 400 shares of Mission common stock on September 20,

The defendants in this case are directors of Mission, one of its subsidiaries, and its largest stockholder.[3]

Mission is an insurance holding company organized under the laws of California. Several of Mission's insurance subsidiaries were engaging in commercial, property, and casualty insurance, as well as underwriting, brokerage, and reinsurance. Since mid–1983, when Mission common stock was trading at $36 per share, Mission's financial results have steadily deteriorated, culminating in state conservatorship proceedings against its major insurance subsidiary in late 1985 and the filing of a bankruptcy petition against Mission in early 1986. The defendants assert that Mission's deteriorating condition was fully disclosed in its public filings and statements. Plaintiffs, conversely, allege a fraud, commencing with the 1983 Annual Report, because Mission concealed massive reinsurance obligations and failed to disclose that its loss reserves were inadequate to cover these bad debts in order to hide the company's precarious financial condition. The plaintiffs allege that these omissions inflated the value of Mission stock during the class period and caused them to purchase grossly overpriced stock. They claim to have relied on the "integrity of the market" when making their purchases, i.e., the stock price was based on the market's impersonal assessment of Mission's financial health as publicly reported in its SEC filings.

The defendants have conducted extensive discovery for each plaintiff in order to ascertain their qualifications as class representatives in this action. They have challenged each plaintiff for various reasons, particularly the typicality and adequacy of their representation of the proposed class.

## CLASS CERTIFICATION

This motion is brought under Rule 23 of the Federal Rules of Civil Procedure, the pertinent portions of which provide that one or more members of a class may sue or be sued as representative parties only if:

1. the class is so numerous that joinder of all members is impracticable,

2. there are questions of law or fact common to the class,

3. the claims or defenses of the representative parties are typical of the claims and defenses of the class, and

4. the representative parties will fairly and adequately protect the interests of the class.

See Rule 23(a). The Court notes that the rule is satisfied in this case as to numerosity and common questions of fact and law, and further, that the class action is superior to any other method of adjudication.

■ Here the defendants' objections to the proposed class certification is based upon the alleged atypicality and inadequacy of the representatives. In resolving these questions the Court is aware of the many varied and, to some extent, conflicting decisions on these issues. Analysis of the caselaw indicates that each case turns upon its particular facts and circumstances. Although class certification is generally favored, *e.g.*, *Green v. Wolf Corporation*, 406 F.2d 291 (2d Cir.1968), the Court must feel certain that the class representative

1984, at a price of $11 per price, and sustained a loss when he sold these shares on February 1, 1985 at a price of $7.75 per share. Steiner made his first purchase on May 14, 1984, when he purchased 200 shares at $14.25 per share. He purchased an additional 200 shares at $14.50 in August 1984, and 300 more on October 10, 1984 at $10.50 per share; all but 100 of these shares were subsequently sold at a loss after the class period. Steiner made yet another purchase *AFTER* the disclosure of allegedly concealed information; he purchased 400 shares on February 6, 1986 for $3.87 per share, shortly after Mission had been forced into bankruptcy. Solomon made a single purchase of Mission stock on February 6, 1985 at a price of $8.75 per share, only 9 days before Mission disclosed its

Fourth Quarter 1984 losses on February 15, 1985.

3. Mission itself is not sued because it is presently in bankruptcy, and suits against it are stayed. Plaintiffs' suit against Mission in the Southern District of New York was stayed for this reason, so they subsequently brought this action in the Eastern District of New York against Mission's directors and its largest shareholder, American Financial Corp. ("AFC"). Plaintiff Solomon has also sued a Mission subsidiary, the Pacific Reinsurance Management Corporation, and 2 other individuals. Pacific Reinsurance Management Corp. itself filed for bankruptcy on March 16, 1987.

will discharge his fiduciary obligations by fairly and adequately protecting the interests of the class. In examining the qualifications of the representative his credibility, reliance, and potential conflicts of interest must be considered as the basis of possible unique defenses against him at trial which might affect the outcome of the class suit. With this in mind, the Court examines the qualifications of the named plaintiffs *seriatim*.

## WILLIAM STEINER

William Steiner is challenged for three principal reasons. First, both Steiner and his counsel are presently bringing a derivative suit against Mission, and this commitment creates a conflict of interest in representing a class in this litigation. Secondly, Steiner purchased his Mission shares for a speculative purpose, which renders him atypical compared to the rest of the class. Finally, Steiner is termed a "professional plaintiff" because he has filed 39 securities actions in the last three years and his caseload is so heavy that he can't even remember whether his cases are still active or have been settled.

Concerning the first objection, William Steiner and the law firm representing him, Abbey and Ellis, are both involved as plaintiffs in a derivative suit brought in California state court on behalf of Mission. *Lewis v. Benson*, No. C549832 (Super.Ct., L.A. Cty.; March 7, 1985). Defendants contend that this disqualifies Steiner as an adequate class representative under Rule 23(a)(4), because his commitments to the derivative suit shows an interest contradictory to that of the class he seeks to represent. Steiner argues that this conflict is more theoretical than real, and it should not affect class certification at this time, because the class representatives can always be decertified later if a true conflict prejudices the class members.

When a plaintiff brings a derivative suit seeking recovery for the corporation and simultaneously files a class suit for damages against that same corporation, there is an inherent conflict. One court has written, "it is difficult to understand how an attorney can properly represent the interests of a corporation and its present shareholders in a derivative action brought on their behalf, and, at one and the same time, properly represent its present and/or former shareholders in a class action against the corporation without compromising the independence of professional judgment and loyalty to these two groups of clients with potentially conflicting interests." *Stull v. Baker*, 410 F.Supp. 1326, 1336–37 (S.D.N.Y.1976); *see also Ruggiero v. American Bioculture, Inc.*, 56 F.R.D. 93, 95 (S.D.N.Y.1972); *Hawk Industries, Inc. v. Bausch & Lomb, Inc.*, 59 F.R.D. 619, 624 (S.D.N.Y.1973); *Kamerman v. Steinberg*, 113 F.R.D. 511, 516 (S.D.N.Y.1986).

Other courts hold that the antagonism between class and derivative actions is no more than a "surface duality". *See Heilbrunn v. Hanover Equities Corp.*, 259 F.Supp. 936 (S.D.N.Y.1966); *see also Bertozzi v. King Louie Intl., Inc.*, 420 F.Supp. 1166 (D.R.I.1976); *Kane Associates v. Clifford*, 80 F.R.D. 402 (E.D.N.Y.1978); *In re Dayco Corporation Securities Litigation*, 102 F.R.D. 624, 630 (S.D.Ohio 1984). Nevertheless, these courts also recognize that the circumstances of a particular case may give rise to a potential conflict for someone serving as a class representative and a derivative plaintiff at the same time, and therefore the Court must consider these potential conflicts and deal with them as appropriate.

The plaintiffs particularly emphasize *Kane Associates v. Clifford* in their argument. In *Kane, supra*, the success of a derivative suit was considered a prerequisite for the success of a complementary class action. A derivative suit was brought against a liquidated company's former directors and accountants, because the directors who were sued had sold off all corporate assets and paid a liquidation dividend to its shareholders, so that payment of a judgment was an impossibility. The derivative claims sought "to do no more than fill the coffers of [the company] so that any class action recovery [might] be meaningful." *Kane* at 408.

■ This principle is not applicable to the situation before us. Although Mission is bankrupt, it is a functioning enterprise [4] with creditors and bondholders who would have priority in receiving the benefits of any recovery in the derivative suit. The present shareholders would then get any remaining benefit. Mission is not an empty shell which will simply pass through funds to a victorious plaintiff class here. The instant action seeks to bypass the corporation itself and obtain damages from the directors for people who are mainly former shareholders. This places their interests in conflict with those of the present shareholders. *See Kamerman v. Steinberg, supra,* 113 F.R.D. at 516. Thus this case is distinguishable from *Kane.*

Next, Steiner is also challenged because of the manner in which he accumulated share in Mission. Steiner purchased Mission shares during the class period as the price continued to drop in order to decrease the average cost of his position in Mission, i.e., he "averaged out" his investment. He made three purchases during the class period, sold most of those shares at a loss, and then made another purchase in January 1986, shortly after Mission was delisted from the New York Stock Exchange and forced into bankruptcy. *Supra* note 2. He is a professional investor who observes market fluctuations on an hourly basis at home and regularly trades stocks which he believes are undervalued based on the historic prices of the shares. Indeed, he is also a professional plaintiff who has brought 39 securities lawsuits in the last three years, with a majority of these still pending.

■ The issue involved here is whether Steiner's claim as a named plaintiff is "typical" of the whole class under Rule 23(a)(3). One court has defined the term as follows:

Typicality refers to the nature of the claim of the class representatives, and not to the specific facts from which the claim arose or relief is sought. The proper inquiry is whether other members of the class have the same or similar injury, whether the action is based on conduct not special or unique to the named plaintiffs, and whether all members have been injured by the same course of conduct. (citations omitted).

*Dura–Bilt Corp. v. Chase Manhattan Corp.,* 89 F.R.D. 87, 99 (S.D.N.Y.1981). Accordingly, "differences in the ... size or manner of purchase, the nature of the purchaser, and even the representation influencing the purchase will not render a claim atypical in most securities cases." 4 *Newburg on Class Actions* § 22.12 at 31–33. Consequently, whether a named plaintiff is a sophisticated speculator or a conservative novice is irrelevant unless those differences make his claims inconsistent with those of the class as a whole.

■ The plaintiffs in this case proceed upon the theory that material omissions of information about Mission's financial condition artificially inflated the market price of its stock. Open market purchasers who claim they were damaged by a fraud on the market are not required to prove individual reliance on particular misrepresentations or omissions as long as the materiality of the alleged nondisclosure is established. Reliance will be presumed once materiality is established. *See, e.g., Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *Blackie v. Barrack,* 524 F.2d 891, 906–07 (9th Cir.1975); *Panzirer v. Wolf,* 663 F.2d 365, 368 (2d Cir.1981). Furthermore, such a fraud could deceive both sophisticated and unsophisticated investors identically by inflating the price in an impersonal market. *See Blackie, supra,* at 905; *Michaels v. Ambassador Group Inc.,* 110 F.R.D. 84, 89 (E.D.N.Y.1986). The defendant can, however, rebut the presumption of reliance. *Blackie, supra,* at 906 n. 22.

Thus individual reliance is constantly evaluated by courts deciding whether a named plaintiff is "typical" or not. There is a concern that if a named plaintiff is subject to "unique defenses" concerning

---

**4.** The entity termed "Mission" is an insurance holding company which still does business through a viable subsidiary. Several of its other subsidiaries are also bankrupt and going through liquidation.

his individual reliance, then attention will be diverted away from issues common to the class. *See Lewis v. Johnson,* 92 F.R.D. 758, 760 (E.D.N.Y.1981). This would impair his ability to act as a representative for the class. Also, questions of individual reliance may place the materiality of the alleged misrepresentations into doubt. The circumstances under which Steiner purchased Mission shares must be carefully evaluated.

Although a common investment strategy like "averaging out" an investment will not necessarily subject a plaintiff to unique defenses, *see Kronfeld v. Trans World Airlines,* 104 F.R.D. 50, 53 n. 4 (S.D.N.Y. 1984), there are other factors present here which justify the inference that Steiner used averaging out to make speculative purchases independent of market information. The Court cannot evaluate a set of transactions alone without looking at the motives of the purchaser making them.

For example, in *Lewis v. Johnson, supra,* plaintiff Lewis believed that a company would eventually rebound after declining in price, so he purchased additional shares when the price decreased to "average" the price of the shares he held. Among the factors considered by the court were the 12 other class actions brought by the plaintiff and his statement that he did not return proxy statements because he had no faith in the companies he invested in. The court found that the overall circumstances raised issues of atypical reliance and materiality and refused to certify Lewis. *Lewis,* 92 F.R.D. at 760. In *Kline v. Wolf,* 88 F.R.D. 696 (S.D.N.Y. 1981), *aff'd in relevant part,* 702 F.2d 400 (2d Cir.1983), plaintiff Block made purchases of shares before, during, and after the class period alleged. His purchases after the class period were made after the Allied company went into bankruptcy, when the allegedly fraudulent information in an annual report became public knowledge. The court held him to be a speculative trader subject to unique defenses which vitiated the typicality of his claims and denied certification. *Id.* at 699.

■ Under the particular facts of this case, Steiner's purchase of Mission stock in February 1986 would raise individual reliance and materiality questions that make him unacceptable as a class representative. It seems strange that he would buy Mission stock after the allegedly undisclosed losses became public knowledge and in essence forced the company into bankruptcy. Since he nonetheless purchased more stock after the bankruptcy, his behavior raises doubts about the importance to him of the purported omissions in Mission's reports. He also seems to treat any loss on a stock speculation as a fresh opportunity to gamble on a possible recovery in the courtroom. Accordingly, Steiner is subject to unique defenses which make him an atypical plaintiff, and class certification must also be denied to him on this ground.

■ Finally, it is appropriate to mention in passing that Steiner's litigious nature, without the other factors discussed, would be insufficient to deny certification. Defendant's claims that Steiner cannot keep track of the litigation and has participated in unethical fee arrangements with his attorneys is based upon the details of cases not before this Court, and therefore is not an area of relevant inquiry. *See Lewis v. Black,* 74 F.R.D. 1, 3 (E.D.N.Y.1975); *Kamens v. Horizon Corp.,* 81 F.R.D. 444 (S.D.N.Y.1979) (court sustained instructions not to answer deposition questions pertaining to participation in other lawsuits on relevance grounds).

### BENZION KOENIG

Plaintiff Benzion Koenig is challenged for a number of reasons which may be enumerated briefly. First, his attorneys represent another client in a derivative suit against Mission, thereby creating a conflict of interest for his attorneys with the proposed class. Secondly, Benzion Koenig's alarming unfamiliarity with the facts of his case and the contradictions between his deposition testimony and that of his broker-son Sam Koenig raise serious questions about his credibility and his ability to control the litigation because of language difficulties. Finally, the credibility problem

raises the possibility that Benzion Koenig did not rely on Mission financial statements in making his investment decision.

On the first point, Koenig's counsel, the firm Stull, Stull, and Brody, are also involved in the derivative suit *Lewis v. Benson* on behalf of plaintiff Lewis. This raises similar conflicts for the Stull firm as those which disqualified Steiner's counsel. *See Hawk Industries, supra,* 59 F.R.D. at 624. However, since there are several grounds for Koenig's disqualification, it is not necessary to dwell upon the conflicts of his counsel in determining this motion.

■ On the second argument, Koenig has been challenged because he is unfamiliar with the facts of his case, and therefore cannot exercise independent control over his attorney; consequently, this would make him an inadequate representative under Rule 23(a)(4). He did not read his complaint before it was filed, since he only reads, writes, and speaks Yiddish, not English, and had his son Samuel explain the important parts to him. (Deposition of Benzion Koenig at 69). Benzion Koenig relies upon his son and attorney to guide him through this litigation. He did not meet with his lawyer until he appeared at a deposition in another case in May 1986, well after the basic groundwork of this action had been laid. (Deposition of Samuel Koenig at 133–134). His understanding of the basic cause of action is weak, and Benzion Koenig admits confusion or lack of knowledge frequently in his deposition. For example, he is not sure exactly what insurance Mission actually sells. (B.K. at 66). Although he seems to understand the nature of a class action and also understands why the Mission directors were sued after Mission went bankrupt, he shows little interest in concepts such as "class period", which he leaves entirely to his lawyers. (B.K. at 86–88). He has undoubtedly never seen a Mission financial report, nor does his son think he would comprehend it if he did. (S.K. at 109–110).

Courts have repeatedly acknowledged that the named plaintiffs rely on attorneys to be their strategists, because in complex litigation, the plaintiffs are unlikely to demonstrate mastery of the intricate details. *See* 3 *Newburg on Class Actions* § 15.30 at 250–251 and n. 194. What is crucial is the competence of counsel, and the named plaintiffs require only a basic knowledge of the facts. *E.g., Pellman v. Cinerama, Inc.,* 89 F.R.D. 386, 390 (S.D.N.Y.1981); *Fischer v. IT & T,* 72 F.R.D. 170 (E.D.N.Y. 1976).

Nonetheless, certification has been denied when the plaintiff displays "an alarming unfamiliarity with the suit." *Greenspan v. Brassler,* 78 F.R.D. 130, 131 (S.D. N.Y.1978) (plaintiff failed to meet with attorney until months into litigation, lacked knowledge about facts in complaint); *see also Sicinski v. Reliance Funding Corp.,* 82 F.R.D. 730, 734 (S.D.N.Y.1979) (plaintiff lacked personal knowledge of facts underlying suit); *Levine v. Berg,* 79 F.R.D. 95, 97–98 (S.D.N.Y.1978) (plaintiff lacked familiarity with any of corporation's filed reports and showed no willingness to learn basic facts). Since Benzion Koenig has demonstrated a number of these deficiencies, the above authorities are controlling.[5]

Finally, Koenig's credibility and his reliance on market integrity also has been attacked by the defendants. The contention is that Koenig testified that he wanted a safe investment before his retirement and asked his son to recommend the best stock. On the other hand, defendants point out that if Koenig wanted a safe investment, he could not have relied upon the information his son knew about Mission in making his purchase. The problem here is not whether Benzion Koenig is a "conservative" investor or not or the fact that Mission was losing money in 1984, but whether the contradictions in the testimony put Koenig's reliance on the market in serious question.

---

**5.** It is recognized that a non-English speaking person may rely on an informed relative in bringing a derivative suit. *See Surowitz v. Hilton Hotels Corp.,* 383 U.S. 363, 368–70, 86 S.Ct. 845, 848–50, 15 L.Ed.2d 807 (1966). The qualifi-

cations for class action certification differ from those of a derivative suit, however, since unique defenses based on typicality, reliance, and credibility are not germane to a derivative suit.

An examination of the depositions of both Benzion Koenig and his son Samuel Koenig indicates that Benzion intended to buy a conservative stock and that, predicated upon the recommendation of his son, he believed that Mission stock fell within this category. (B.K. at 21, 28–29). On the other hand, his son knew that Mission stock had dropped from over $20 per share to $11 per share by September 1984 and should have known from published reports that these losses had sharply cut into Mission's net worth in 1984. (S.K. at 102, 118–119). Samuel Koenig personally reviewed the 1983 Annual Report, which showed a net worth of approximately $215 Million and a Standard & Poors sheet which indicated a loss of $55 Million during the first half of 1984. (S.K. at 96–97). This cut its net worth by approximately 25%, and if those losses continued at the same rate for the rest of 1984, Mission's net worth · would drop by 50%. If Samuel Koenig had informed his father of this fact, it is hard to believe that his father relied upon conservative investment criteria in purchasing the stock. If, however, Samuel Koenig did not inform his father of these losses, then his father did not rely upon publicly available information, i.e., the integrity of the market, when he made his purchase.

█ In the Second Circuit a proposed class representative can be ruled inadequate under Rule 23(a)(4) if he is vulnerable to attacks on his credibility concerning the key facts at issue in the case. The lack of credibility required before a person can be denied certification must be obvious and clear. *See Kline v. Wolf,* 702 F.2d 400, 401–403 (2d Cir.1983) (evasive testimony, reliance on nonexistent documents); *Panzirer v. Wolf,* 663 F.2d 365 (2d Cir.1981) (multiple contradictions in testimony); *Darvin v. International Harvester,* 610 F.Supp. 255 (S.D.N.Y.1985) (deposition testimony contradicts allegations in complaint); *Cohen v. Laiti,* 98 F.R.D. 581 (E.D. N.Y.1983) (plaintiff contradicts complaint, relies on non-existent documents, and admits use of inside information).

█ Alternatively, Benzion's Koenig's reliance is questionable if his son didn't tell him all the facts. Reliance on a secondary source of information does not itself make a plaintiff atypical. *Panzirer v. Wolf, supra,* states that there is no distinction under the securities laws between primary and secondary reliance. 663 F.2d at 367. In *Panzirer* the Second Circuit reversed the trial judge, who found that the plaintiff's reliance inadequate because she acted upon a report in the Wall Street Journal. Clearly, there is no bar to the use of secondary sources as long as those sources are based upon the financial reports of the company in making an analysis. This pertains to personal advice as well as to publications. As stated by Judge Weinfeld, "Reliance on third parties such as investment counselors or knowledgeable family members is likely to be typical, not atypical, of the circumstances under which a substantial number of class members purchased their stock." *Kronfeld v. Trans World Airlines, supra,* 104 F.R.D. at 53.

█ The implicit assumption of these cases is that the secondary source accurately conveys the publicly available information about the company in making an analysis or summary for the prospective investor. The facts of the present case place that predicate into serious doubt. The conflicting testimony of Samuel and Benzion Koenig shows a failure of communication that interfered with Benzion Koenig's access to relevant market information about Mission, and this makes Benzion Koenig subject to a unique defense concerning his individual reliance. On balance Koenig is not qualified for certification.

### STUART SOLOMON

Finally, there does exist one plaintiff whom the Court can certify despite the defendants' vigorous opposition. This person is Stuart Solomon. Solomon has a master's degree in business administration and has worked in a bank selling municipal bonds. (Depo. at 8, 24). He receives suggestions for stock purchases from his broker, Edwin Jacob, and generally reviews a Standard and Poors report on a company before making an investment decision. He doesn't make a purchase without reviewing

factors such as the net worth, historical earnings, book value, and current market price of the company. (Depo. at 72–73, 81).

Solomon was seeking an investment for his IRA account and believed that banks, utility and insurance companies were conservative long term investments. Jacob suggested Mission to him in January 1985, stating that the insurance industry had been overlooked by the market and was due for a cyclical rebound. (Depo. at 78–81). Solomon was informed of Mission's net losses, but stated that such losses would only dissuade him if they caused the company to fall into a negative net worth. This was not the case with Mission in early 1985, and Solomon believed that short-run losses in a conservatively structured industry, such as insurance, would not imperil the company. He also believed that Mission's earnings would soon rebound.[6] (Depo. at 82–83, 86–87). Solomon testified that he never discussed AFC or any other individual's position in Mission prior to his purchase. (Depo. at 100–101).

■ The defendants argue that plaintiff Solomon is subject to a unique defense, because he primarily relied upon his broker's advice in making his purchase, and the broker himself did not rely on the market's integrity. Edwin Jacob had been recommending Mission stock to his clients in February 1985 because he believed that Carl Linder, who is on Mission's Board of Directors, would commit fresh capital to rescue the firm from its dire financial situation. Defendants seek to impute this knowledge to Solomon, since Jacob was his adviser, and thereby argue that a potential bailout was Solomon's sole reason for buying Mission stock. They claim the case at bar is similar to *Axelrod v. Cities Service Co.*, Fed.Sec.L.Rep. (CCH) P 99,131 (S.D.N.Y.1983) [Available on WESTLAW, DCT database] and also *Cohen v. Laiti*, 98 F.R.D. 581, 583 (E.D.N.Y.1983). In the former case the plaintiff relied on arbitrageurs and

other professional traders, while in the latter the plaintiff relied on tips and inside information. The Court finds that these cases are inapposite, since Solomon's reliance is based upon different factors.

Defendants' entire argument rests on vague, ambiguous statements made by Jacob in his deposition. He stated that Linder's position was a controlling factor in his evaluation of Mission. Jacob also thought he "might have" mentioned Linder's holdings to his customers during early 1985. (Deposition of Jacob at 117–118). At no point does Jacob say that he specifically gave this information to Solomon, which in fact Solomon has expressly denied. Jacob's statements do not contradict the detailed testimony given by Solomon about his motives for purchasing Mission stock.

■ Even if Jacob did pass on information to Solomon about a potential bailout, this would not necessarily vitiate his reliance on the market. *In re AM Intl. Securities Litigation*, 108 F.R.D. 190, 195 (S.D.N.Y.1985), holds that the consideration of factors besides the financial statements does not make a plaintiff subject to unique defenses. A belief that new management could improve the company will not destroy reliance when considered together with the reported financial condition of the company. *Id.* at 195. Consequently, the defendant's argument is without merit.

## PROPER DURATION OF THE CLASS PERIOD

■ Defendants argue that Solomon cannot represent the class for the full period from March 29, 1984 to February 15, 1985, because he made his purchase on February 6, 1985, almost at the end of the class period. Defendants emphasize that the price of Mission shares dropped substantially during the class period as its losses grew and that Solomon purchased

---

**6.** Plaintiff Solomon also emphasizes that a "turnaround" strategy does not make an investor atypical. It is normal to expect that a company with recent losses can return to profitability when market conditions improve. *See Michaels v. Ambassador Group*, 110 F.R.D. 84, 89

(E.D.N.Y.1986). If the plaintiffs are termed atypical speculators because Mission had lost money just before they bought its stock, then every member of the class is also a speculator by the same logic. Nothing would differentiate Solomon from other shareholders.

shares after Mission's report for the third quarter of 1984 disclosed a large loss of $99.7 Million. Their claim is that Solomon will not adequately represent earlier purchasers who acquired shares at higher prices and only relied on the 1983 Annual Report, disclosing only a $15 Million loss.

This argument misses the gravamen of the plaintiff's complaint, which alleges that the fraudulent concealment of reinsurance obligations began with the 1983 Report. The alleged fraud therefore commonly affects all shareholders throughout the period that information was withheld. This is the common question of fact and law which links the class together. The only difference between class members is the level of damages. *See, e.g., Sirota v. Solitron Devices, Inc.,* 673 F.2d 566, 572 (2d Cir.1982); *see also Friedlander v. Barnes,* 104 F.R.D. 417, 420–22 (S.D.N.Y.1984); *Michaels v. Ambassador Group, supra,* 110 F.R.D. at 89–90; *In re AM Intl. Securities Litigation, supra,* 108 F.R.D. at 192–193; *Dura–Bilt Corp. v. Chase Manhattan Corp., supra,* 89 F.R.D. at 99–100.

Accordingly, the class period proposed by Solomon seems appropriate for purposes of this class certification motion. If evidence shows that this initial period is inappropriate, the Court can always take remedial steps at a later date.

## CONCLUSION

Under the circumstances, it is obvious that *Koenig and Steiner v. Benson,* 86–CV–1391, cannot proceed as a class action. In *Solomon v. Pacific Reinsurance Management Corp.,* 86–CV–4290, plaintiff Stuart G. Solomon is granted certification as the representative of the plaintiff class which purchased Mission stock during the period March 29, 1984 to February 15, 1985. Koenig and Steiner may be included in the class certified in the Solomon suit, and if they do not opt out of the class, their present suit will be dismissed.

SO ORDERED.