William R. FRY, Anthony J. Marra, Sidney Mishkin, Thomas J. Dwyer, Kathleen B. Dwyer, Progressive United Corporation, Meridian Strategic Investments, L.P., Plaintiffs,

v.

UAL CORPORATION, a Delaware Corporation, Defendant.

No. 90 C0999.

United States District Court, N.D. Illinois, E.D.

May 1, 1991.

David B. Kahn, Fay Clayton, Mark E. King, Kahn Robinson Curley and Clayton, Chicago, Ill., for plaintiffs.

Duane M. Kelley, Kevin E. White, Thomas J. Wiegand, Winston & Strawn, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

NORDBERG, District Judge.

Plaintiffs brought this action on behalf of themselves and others who sold Allegis Corporation common stock or puts in Allegis Corporation common stock between October 29, 1987 and December 8, 1987 (the "class period").[1] Plaintiffs seek damages under § 10(b) and Rule 10b–5 of the Securities Exchange Act of 1934, and under state law, for losses sustained from these sales, which were allegedly induced by certain false and misleading statements and omissions by UAL Corporation. Jurisdiction over the federal claims is asserted under § 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, and over the state claims pursuant to principles of pendant jurisdiction.

This matter is presently before the court on plaintiff's motion for class certification pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure. UAL opposes class certification on the grounds that the named plaintiffs do not adequately represent the class, the individual claims of the named plaintiffs will predominate over those of the class, and the claims of the class members will be in conflict. For the reasons set forth below, the court finds UAL's objections to be without merit. Accordingly, the court will certify a class of sellers of Allegis Corporation common stock and puts in Allegis Corporation common stock, as described in the complaint, reserving the right to alter, amend or modify the class pursuant to Rule 23(c).

## STATEMENT OF FACTS

On May 26, 1987, a group led by Coniston Partners, a firm specializing in leveraged buy-outs, takeovers and proxy solicitations, purchased approximately 13% of the common stock in Allegis Corporation. Subsequently, as the largest shareholder, Coniston began to exert pressure on Allegis to divest itself of its non-core businesses —namely, its car rental and hotel business-

1. Because defendant UAL was known as Allegis Corporation during the class period, the securities at issue will be identified as Allegis common stock or puts in Allegis common stock.

es—and to distribute the proceeds to shareholders.

On June 9, 1987, Richard J. Ferris, the chairman of the board and chief executive officer of Allegis who had engineered the acquisition of the non-core businesses, resigned. That same day, the board retained The First Boston Corporation to devise a plan for the sale of the non-core businesses. On June 15, 1987, the board announced that it had approved a plan to sell the non-core businesses and distribute the proceeds to shareholders. On October 29, 1987, Allegis announced that the proceeds of its divestiture program would be distributed through a special dividend. That this would be the mechanism for distribution was reiterated by Allegis and reported by the financial press on several occasions between October 29, 1987 and December 8, 1987.

Plaintiffs contend, however, that beginning in the summer of 1987 and continuing through the spring of 1988, Coniston was negotiating with Allegis to distribute the proceeds of the divestiture program through a buy-back of shares, rather than through a special dividend. While allegedly contemplating the buy-back program at Coniston's behest, Allegis continued to publicly assert its intention to issue a special dividend, without mentioning its ongoing negotiations with Coniston.

In early December, 1987, prices for puts in Allegis common stock began to rise. On December 3, 1987, plaintiff Fry, acting for himself and other named plaintiffs, called the Department of Investor Relations of Allegis Corporation to confirm the company's intention to distribute the proceeds from the sale of the non-core businesses through a special dividend and to investigate the reason for the sudden increase in the stock's price. Fry was told that the special dividend was still the intended means of distribution. No mention was made of the negotiations with Coniston.

On December 7, 1987, in a telephone conversation between Dwyer and Fry, the two investors attempted to determine why put prices were rising when share prices were firm or rising. Because put values and share prices rarely track each other, they assumed that certain information had not been publicly disclosed. Dwyer suggested that they bring a tax accountant into their conversation to help them theorize about this unusual behavior. The accountant advised them that if the distribution did not take place through a dividend, a tender offer could be used. The accountant further explained that a tender offer presented tax benefits to shareholders, because only the difference between the offer price and the basis would be taxable. A dividend, on the other hand, would be wholly taxable to most shareholders.

On December 8, 1987, an article in the *Wall Street Journal* announced that sources close to the defendant had revealed that Coniston was pushing for the divestiture proceeds to take the form of a partial stock buy-out rather than a special dividend. The next day, December 9, 1987, the defendant's board of directors announced that "as a result of recent changes in stock market conditions and in consultation with its financial advisor, The First Boston Corp., it is considering a tender offer for a substantial number of shares of its common stock as an alternative to the previously announced intention to declare a dividend as the method of distribution to its stockholders of the net proceeds from the sales ..." These rumors that Allegis was considering a buy-back boosted the price of its stock and also the price of puts in its stock.

Allegis formally announced its intention to distribute the proceeds from the sale of its none-core businesses through a buy-back of shares, rather than through a special dividend, on January 29, 1988. An offer to purchase up to 35,500,000 shares for $80 a share was formally issued by the defendant on February 17, 1988. In its offering memorandum, Allegis stated that it had been discussing the possibility of a buy-back with Coniston since the summer of 1987.

According to the plaintiffs, share prices rose with the news of Allegis Corporation's intended self-tender, because of the perceived tax advantages of this method of

distribution. Similarly put prices rose in anticipation of the fall in price of the outstanding shares after the buy-back. Such a price drop would benefit put holders and hurt those put sellers whose securities had a post buy-back expiration date.

Because the plaintiffs had sold their securities before Allegis publicly announced its intention to proceed with a buy-back, on December 9, they sold at prices which were artificially deflated by the prior public announcements. By assuming that the market reflected all information relevant to price, when Allegis was allegedly withholding relevant information, the plaintiffs claim that they were damaged.

## ANALYSIS

Rule 23 of the Federal Rules of Civil Procedure governs class actions. To certify a proposed class, the court must find that the class and its proposed representatives have met the four prerequisites enumerated in 23(a). In addition, if those prerequisites have been met, the court must find that the procedural considerations set forth in one of the alternatives under 23(b) mandate bringing the suit as a class action. In this case, plaintiffs contend that the claim satisfies 23(b)(3), which requires that common questions of law and fact predominate over any question affecting only individual members, and that a class action is superior to other available methods of adjudicating the controversy. In ruling on a motion for class certification, "the allegations are taken as true and the merits of the complaint are not examined." *Allen v. Isaac*, 99 F.R.D. 45, 49 (N.D.Ill.1983).

*Numerosity.*

■ The first prerequisite to maintaining a class action dictates that the class must be "so numerous that joinder of all members is impracticable." F.R.C.P. 23(a)(1). While the plaintiffs are not required to state with certainty the exact number of class members, *Marcial v. Coronet Ins. Co.*, 880 F.2d 954 (7th Cir.1989), they are required to base their estimate on more than mere speculation.

The plaintiffs do not yet know with certainty the number of people in the class, although they estimate the number to be in the thousands based on the number of shares sold during the class period. During that time, according to public records, approximately 14.5 million shares of common stock and 32 thousand puts were sold. The plaintiffs assume that the sales of millions of shares traded on a national exchange would necessarily involve a large number of people from disparate locations, making joinder "impracticable." In *Zeidman v. J. Ray McDermott & Co., Inc.*, 651 F.2d 1030 (5th Cir.1981), the Fifth Circuit found that the submission of the number of shares traded could satisfy the numerosity requirement. This assessment was based in part on the understanding that a resolution of whether a class satisfies the numerosity requirement should focus on more than the numbers involved. Other relevant factors include: "the geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim." *Id.* at 1038; *see also*, Newberg, Class Actions § 3.06 at 143 (1977).

In this case involving nationally traded shares, it is likely that the geographical diversity among the class members is great. UAL does not object to the class on the grounds of numerosity, and this court believes the requirement to have been met.

*Commonality.*

■ UAL does not raise any objections to the second requirement, mandating that the named plaintiffs raise "questions of law or fact common to the class," insofar as the federal claims are concerned. F.R.C.P. 23(a)(2). This prerequisite involves judging whether the class, which has already been determined to be too numerous for joinder, shares common issues to be adjudicated. Newberg, § 13.10 at 153. In this case, it is clear that the plaintiffs raise questions of fact and law shared by all class members: whether Allegis and Coniston had ongoing discussions about the form that a distribution should take, such that Allegis Corporation's public statements misrepresented or omitted material facts in violation of Rule 10b–5 to the detriment of the class members. *See, e.g., Res-*

*nick v. American Dental Ass'n,* 90 F.R.D. 530, 538 (N.D.Ill.1981). These issues which constitute the essence of the class's federal claims meet the commonality requirement.

■ UAL argues, however, that the Illinois common law fraud claims defeat a finding of commonality, because the court will have to apply different state law rules to different class members, depending on their state of citizenship. Choice-of-law rules dictate, however, that such a problem will not arise. Under the "most significant contacts" rule, which Illinois has adopted, Illinois law applies, because the corporate headquarters of UAL are located in Illinois and the alleged misrepresentations issued from those Illinois offices. Thus, other cases involving allegations of misrepresentation in transactions concerning securities bought and sold on a national exchange have been certified both as to federal securities and Illinois fraud claims. *See e.g., Ridings v. Canadian Imperial Bank of Commerce Trust Co. (Bahamas), Ltd.,* 94 F.R.D. 147 (N.D.Ill.1982); *Helfand v. Cenco, Inc.,* 80 F.R.D. 1 (N.D.Ill.1977). Accordingly, the court does not find that the state law fraud claims defeat the commonality requirement.

*Typicality.*

The third prerequisite set forth in 23(a) is that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." F.R.C.P. 23(a)(3). While the first two requirements of 23(a) focus on the class, the second two requirements, typicality and adequate representation, "focus instead on the desired characteristics of the class representative." Newberg, § 3.13 at 163. The Seventh Circuit has defined typicality as follows:

> We think … that subsection (a)(3) primarily directs the district court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large. 'A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal

theory.' H. Newberg, *Class Actions* § 1115(b) at 185 (1977). The typicality requirement may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members. Thus similarity of legal theory may control even in the face of differences of fact.

*De La Fuente v. Stokely–Van Camp, Inc.,* 713 F.2d 225, 232 (7th Cir.1983) (citations omitted).

Because Fry and Thomas Dwyer are professional investors, UAL contends that it will be able to assert unique defenses against them which are likely to predominate the proceedings. Specifically, UAL suggests that Fry did not merely rely on the integrity of the market to make his investment decisions, but instead went "behind the market" in an attempt to understand its movements. Thus, according to UAL, Fry is atypical because he studied business publications, consulted with various brokers, including Dwyer, a broker for Prudential Bache, and contacted what was then Allegis Corporation's Department of Investor Relations. In other words, UAL claims that unlike other potential class members, Fry did not rely on the market; instead, he was a market manipulator.

■ Reliance on reports published in standard business publications, such as the Wall Street Journal, however, is effectively reliance on the integrity of the market. *Katz v. Comdisco, Inc.,* 117 F.R.D. 403, 409 (N.D.Ill.1987); *Panzirer v. Wolf,* 663 F.2d 365 (2d Cir.1981), *vacated on other grounds, Price Waterhouse v. Panzires,* 459 U.S. 1027, 103 S.Ct. 434, 74 L.Ed.2d 594 (1982). In addition, while UAL suggests that Fry's frequent discussions with various brokers, including Dwyer, necessarily renders his claims atypical, this is not the case. *Ridings,* 94 F.R.D. at 152; *Hochschuler v. G.D. Searle & Co.,* 82 F.R.D. 339, 344 n. 8 (N.D.Ill.1978). UAL has produced no evidence to support the innuendo that Dwyer or the other brokers were privy to inside information that they might have shared with Fry. Even if Fry's actions indicate an attempt to more thoroughly understand the market, they do not inherently

demonstrate a failure to rely on the market. This differentiates Fry's behavior from that of the investor in *Lewis v. Johnson*, 92 F.R.D. 758, 760 (E.D.N.Y.1981), upon which UAL relies. Fry claims that he sold his puts in reliance on publicized accounts that Allegis intended to distribute proceeds through a dividend. While he had confirmed these accounts by calling Allegis directly, this information had also been reported in the Wall Street Journal. It was not until December 8, 1987, when the Wall Street Journal reported rumors of Allegis Corporation's intention to distribute the proceeds through a self-tender that Fry realized that his earlier sales had left him in a vulnerable position. At that point, he proceeded to close-out his put positions. Therefore, Fry's actions with respect to his Allegis holdings cannot be said to be clearly based on information that was not readily available to all of the members of the class. Any potential questions of reliance raised by Fry's behavior will be applicable to the entire class membership.

In support of its argument that Fry and Dwyer will be subject to unique defenses as market manipulators, UAL argues that due to their significant holdings on behalf of themselves and others, they were responsible for moving the market when they purchased puts on the open market on December 8. In other words, UAL will attempt to demonstrate that the alleged "doubling and tripling" of premiums on Allegis puts was not a response to rumors of Allegis Corporation's decision to employ a self-tender, but was instead caused by Fry and Dwyer as they rushed to close out their Allegis positions. UAL points to the fact that on December 8, 1987, those two investors accounted for about 30% of all Allegis put transactions, and nearly all of the activity involving puts with February and May expiration dates. UAL's Response, p. 18.

■ Plaintiffs argue that any price fluctuation subsequent to the sale of their securities is irrelevant, because it focuses on the wrong transaction. In cases arising under § 10(b) and Rule 10b–5, courts generally employ the out-of-pocket losses rule

of damages. Under this rule, a defrauded seller may recover "the difference between the fair value of all the ... seller received and the fair value of what he would have received had there been no fraudulent conduct ..." *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972) (citations omitted); *Rowe v. Maremont Corp.*, 850 F.2d 1226, 1240 (7th Cir.1988). The fair value of the stock is measured as of the date of the sale. *Jordan v. Duff and Phelps, Inc.*, 815 F.2d 429, 442 (7th Cir.1987). Because subsequent purchases by the plaintiffs are irrelevant to the liability of UAL with regard to alleged misrepresentations effecting the earlier sales of securities by the plaintiffs, such purchases do not render the claims of Fry and Dwyer atypical. The presentation of the class claim will not be hampered by the December 8 purchases, particularly in the absence of any evidence that they were the result of speculation on the part of Fry and Dwyer.

■ In further support of its depiction of Fry as a market manipulator, UAL casts Fry as a litigious person who utilizes litigation as an investment strategy and as a means of enhancing relations with his clients when investments sour. These elements of Fry's behavior, according to UAL, will disrupt a class action by focusing attention on further defenses unique to Fry.

UAL alleges in support of its customer relations theory that after closing out his put positions, Fry contacted his clients to explain the losses incurred. While he mentioned Allegis Corporation's alleged misrepresentation, UAL charges that Fry failed to mention his frequent discussions with Dwyer, his reasons for initially investing in Allegis and his conversation with Dwyer's tax accountant. UAL asserts that this suit was brought as Fry sought to deflect attention from his own poor judgment to UAL's alleged misdeeds. Fry only chose to pursue this claim in earnest almost two years after the alleged misdeeds, according to UAL, because at that point, Fry's customers were beginning to really plague him about the losses they had suffered at his hands.

This allegation by UAL has no support in the record. While it is one explanation for Fry's behavior, an equally plausible explanation is that offered by the plaintiffs: that Fry suggested UAL's liability in the matter, because he sincerely believed its behavior to have caused his losses. Moreover, this court refuses to infer suspect behavior from Fry's nearly two year delay in filing suit, when such a delay is within the applicable statute of limitations period.[2]

Similarly, UAL's suggestion that Fry uses litigation as an investment strategy has no support in the record. A bald accusation such as that cannot be used to defeat class certification in the absence of convincing evidence. While in some cases, courts have considered repeated litigation brought by a plaintiff, coupled with other factors such as averaging out, to deny certification on the grounds of lack of typicality, *see, e.g., Koenig v. Benson,* 117 F.R.D. 330, 336 (E.D.N.Y.1987), there is no indication that Fry lacked faith in Allegis or that he engaged in speculative trading in Allegis securities. According to Fry, his interest in Allegis was based on confidence in share value, following Coniston's asserted intent to strengthen shareholder value. Fry's involvement in other class action suits, absent other evidence of speculation, is not enough to defeat certification of the class. *Koenig,* 117 F.R.D. at 336.

In addition to claiming that certain unique defenses available against Fry and Dwyer preclude certification, UAL maintains that the claims of the plaintiffs pose an inherent conflict with the claims of putative class members. UAL argues that recovery on one portion of the classes' claims necessarily precludes recovery on the remaining claims.

The essence of UAL's claim that a conflict exists rests on its assumption that plaintiffs seek to represent class members whose claims will require contradictory proof. To prevail on their claim, sellers of Allegis puts will have to prove that disclosure of the allegedly omitted information would have caused Allegis share prices to decrease, while sellers of Allegis shares will have to prove that disclosure would have caused an increase in the share price. UAL's argument with respect to the shareholders is clear enough. The shareholders' argument is that by selling their shares during the class period, before Allegis had disclosed its intended form of distribution, they sold at depressed prices. Essentially, they must claim that share prices would have increased had that information been made public earlier. Sellers of puts, on the other hand, will have to argue that they could have commanded a higher premium had Allegis disclosed the intended form of its distribution. The price of put contracts reflects the possibility that the put seller will have to pay more than market price for the shares the contract obligates him to purchase. Thus, an argument that put sellers sold at deflated prices depends on proof that disclosure would have decreased the market price of put contracts. In other words, because the price of a stock and the value of an option do not track one another, UAL argues that the sellers of each have divergent interests.

The plaintiffs claim, however, that in this instance, the price of the common stock and the value of put contracts both rose upon disclosure that the distribution would be in the form of a self tender. Stock prices rose because of the acknowledged tax benefits of a self tender over a stock dividend, and the value of put contracts rose because of the risk that the seller would have to pay more than market price for the underlying shares.

Assuming arguendo that UAL's assertion that put values and share prices do not track one another is correct, this fact will not necessarily prevent certification of the class. While UAL is correct in its assertion that an inherent conflict among the members of the class may prevent certification,

---

2. Section 10 of the Securities Exchange Act of 1934 contains no limitations period. Accordingly, the Seventh Circuit has recently held that the three-year limitations period contained in § 13 of the Securities Act of 1933 should apply to actions brought under § 10 of the 1934 Act. *Radiology Center, S.C. v. Stifel, Nicolaus & Co.,* 919 F.2d 1216, 1223 (7th Cir.1990); *Short v. Belville Shoe Mfg. Co.,* 908 F.2d 1385 (7th Cir. 1990).

the mere fact that those involved in the action held their securities in different forms is not necessarily fatal to a finding of typicality. Two district courts have addressed comparable claims and, in both cases, have declined to find a prohibitive conflict.

In *Hochschuler*, 82 F.R.D. 339, the court rejected the defendant's contention that one of the plaintiff's claims was atypical when his purchase of the securities at issue was pursuant to a put contract. The defendant sought to convince the court that the sale of a put is distinguishable from the purchase of a security. The court cited Newberg, however, for the principle that "differences in the amount of damage, the size or manner of purchase, the nature of the purchaser, and even the specific document influencing the purchase will not render a claim atypical in most securities cases." *Id.* at 347, *citing* Newberg, § 8816 at 850. Accordingly, the court held that the seller of the put option did not fail the typicality prong, because he had to prove the same case as the purchasers of common stock. In that case, arguably unlike in the present case, however, both the seller of the put options and the purchasers of common stock sought to argue that lack of disclosure by the defendant served to artificially inflate the value of the securities, to the detriment of them all.

The challenge posed by defendants was addressed directly in *In re McDonnell Douglas Corp. Sec. Litigation*, 98 F.R.D. 613, 620 (E.D.Mo.1982), however, and found not to defeat typicality. In that case, the court rejected the idea that because the price of common stock and the value of a call option do not track one another call option purchasers and stock purchasers have different interests. Because both groups sought to establish the alleged omissions of the defendant and to prove the defendant's liability, the typicality requirement was satisfied. The court found that "any variation in damages based on the differences in price movement that may arise can be addressed later if liability is established through, for example, the creation of subclasses." *Id.*

 This court agrees with the reasoning of the court in *McDonnell Douglas*, and finds that any alleged conflict in the fact that Fry and Dwyer were primarily sellers of put contracts as opposed to sellers of common stock will arise at the damages stage of the litigation and does not prevent a finding of typicality. Similarly, any efforts by the plaintiffs to close out their put position is relevant to damages, not liability, and can be resolved separately. In addition, the alleged defenses with which UAL seeks to challenge the typicality of Fry and Dwyer's claims are either available against all potential class members or are based on unsupported speculation that is insufficient to preclude certification. Accordingly, UAL has failed to demonstrate that the claims of Fry and Dwyer are not typical of those of putative class members. They, like the other class members, will have to demonstrate that they relied on material misstatements or omissions on the part of Allegis in deciding to sell their Allegis securities.

*Adequacy of Representation.*

Even if their claims are typical, putative plaintiffs may not represent the proposed class unless they can demonstrate that they "will fairly and adequately protect the interests of the class." F.R.C.P. 23(a)(4). This requirement is composed of two elements. The first is the requirement that the plaintiffs will vigorously pursue the litigation on behalf of the class. The second is the requirement that the plaintiffs' interests not conflict with those of the class members. Newberg, § 3.22 at 198; *Katz*, 117 F.R.D. at 410. An analysis of whether the plaintiffs' claims conflict with those of the class under Rule 23(a)(4) is more comprehensive than that under Rule 23(a)(3):

> The adequacy test includes, but is broader than, the typicality test. A representative may have typical claims but otherwise have a conflict with the class unrelated to those typical claims or may not be able to demonstrate able counsel who will vigorously prosecute the litigation on behalf of the class.

Newberg, § 3.22 at 200 (footnotes omitted). Because UAL contended that the plaintiffs' claims were not properly aligned with those of the class, this court analyzed the alleged conflict under the rubric of typicality and need not repeat itself here.

While UAL has not suggested that counsel for the plaintiffs is not qualified, it charges certain of the plaintiffs with failing to diligently pursue the litigation. UAL maintains that Anthony Marra, Sidney Mishkin, and Kathleen Dwyer are inadequate representatives of their class, because they were not responsible for the investments in Allegis securities that were made in their names. In addition, according to UAL, these plaintiffs, along with Thomas Dwyer, know too little about their alleged claim against UAL and have failed to vigorously pursue the litigation.

 Looking first to UAL's claim that Marra, Mishkin and Kathleen Dwyer are inadequate representatives because they had no active role in Allegis investments, this court finds that reliance on the investment decisions of another does not inherently disqualify a plaintiff as an inadequate representative. While UAL cites two cases from this district to support its contention, the investment decisions made in those cases raised other reliance issues, which were ultimately dispositive of the adequate representation issue.

Thus for example, in *Epstein v. American Reserve Corporation*, No. 79 C 4767, 1988 WL 40500 (N.D.Ill.1988), the court did not find, as UAL implies, that wives whose spouses made the investments for them were necessarily disqualified as inadequate representatives of the class. Instead, the court based its decision on the fact that certain reliance issues that were different from those of justifiable reliance on the market were raised by the particular broker upon whom the husbands relied for investment advice. Specifically, the court deemed it possible from the pattern of trading activity that the broker had inside information, which he employed in advising the husbands. Similar unique reliance issues were dispositive in the second case cited by UAL, *Cohen v. E.F. Hutton &*

*Co.*, No. 87 C 5678, 1988 WL 89437 (N.D.Ill. 1988).

Moreover, courts that have addressed the issue of third-parties making the recommendations and purchases of the relevant stocks have found that such reliance does not render a plaintiff inadequate. The Southern District of New York found that although the stock at issue was purchased by the plaintiff's father, the plaintiff would nonetheless provide adequate representation of the class. *Kronfeld v. Trans World Airlines, Inc.*, 104 F.R.D. 50, 53 (S.D.N.Y.1984). The court noted that:

> Reliance on third parties such as investment counselors or knowledgeable family members is likely to be typical, rather than atypical, of the circumstances under which a substantial number of class members purchased their stock. Such reliance is not necessarily incompatible with a finding that the fraud was a "significant contributing cause" of their injuries.

*Id.* (footnotes omitted). *See also Ettinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 122 F.R.D. 177, 181 (E.D.Pa.1988). Both *Kronfeld* and *Ettinger* suggest that a certain minimal level of participation by the plaintiff in the relevant stock transaction must be demonstrated. *See also Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 370, 86 S.Ct. 845, 849–50, 15 L.Ed.2d 807 (1966); *Tomkin v. Kaysen*, 69 F.R.D. 541 (S.D.N.Y.1976). On-going discussions with the person executing the relevant stock transactions, for example, serve to fulfill this requirement.

The deposition testimony of Kathleen Dwyer reveals that she discussed the investments in Allegis securities with her husband before he made the purchases in her name. Similarly, Mishkin, while not executing the orders for Allegis securities himself, testified that he discussed his investments regularly with Fry, who handled the transactions for him. Neither of these two plaintiffs can be deemed inadequate representatives based on their unfamiliarity with the relevant transactions.

 Anthony Marra, on the other hand, stated in his deposition testimony that Fry

had complete discretionary authority over his account, and that, accordingly, Marra has never followed the affairs of UAL Corporation. Marra intimates that he was not even aware that his funds had been invested in what was then Allegis. The cases do not support a finding that someone who abdicated complete authority over his relevant financial affairs can be found an adequate representative. Accordingly, this court finds that Anthony Marra is an inadequate class representative.

UAL also attacks Thomas Dwyer, Kathleen Dwyer, and Sidney Mishkin as inadequate representatives, on the grounds that they have demonstrated little interest in pursuing the litigation and have effectively left the litigation in the hands of Fry. All of the plaintiffs, however, revealed in deposition testimony that they were cognizant of the reasons the suit had been brought, that they were willing class representatives and that they were willing to share in the costs of the litigation.

For example, Kathleen Dwyer testified that she knew that she was a plaintiff named in the complaint and that in January, 1990, before the action was brought, she had discussed with her husband their intention to file a complaint against UAL. At that point her husband, Thomas Dwyer, summarized the claim for her. During her deposition, she exhibited a clear understanding of both the alleged misrepresentation and her own commitment as a named plaintiff to share in the costs of the litigation on a pro rata basis. The only confusion she displayed during her testimony surrounded the question of whether her husband or Fry had gathered the documents that had been produced in discovery.

Thomas Dwyer testified that he had expressed the potential liability of Allegis with Fry in late 1987. Throughout the succeeding months, he and Fry discussed on numerous occasions their belief that they had been wronged and should seek redress. In late 1989, Fry contacted him to say that he had located counsel who were willing to represent them. While Dwyer believed that suit had been brought in February, 1990, he could not say with certainty when the complaint was filed. Fry had contacted him at about that time to tell him that of his intention to go ahead with the action. Although it was not until the day of his deposition that Dwyer first read through a copy of the complaint, he exhibited in his deposition testimony a ready understanding of the issues comprising the claim against UAL.

Like the Dwyers, Sidney Mishkin never attempted to retain counsel on his own behalf. Instead he relied on Fry, with whom he was in regular contact, to take the suit forward. At his deposition in the summer of 1990, Mishkin testified that he had read a copy of the complaint several weeks earlier, and he manifested a complete understanding of the action against UAL. As had Kathleen Dwyer, Mishkin testified that he had not personally complied with the document request.

■ This court is satisfied that each of these plaintiffs has met the requirements of 23(a)(4). Each understands what the lawsuit is about and is reasonably apprised of the progress of the litigation. As is particularly true in the complex realm of securities litigation, "[p]laintiffs need not know all the ins and outs of a case in order to be class representatives; they are entitled to rely upon their lawyers in gathering evidence to be used at trial." *Grossman v. Waste Management, Inc.*, 100 F.R.D. 781, 190 (N.D.Ill.1984); *Harman v. LyphoMed, Inc.*, 122 F.R.D. 522, 528 (N.D.Ill.1988). As each of these plaintiffs maintained a certain degree of interest in their investments in Allegis and has kept reasonably abreast of developments in the suit, they will certainly provide adequate representation within the meaning of Rule 23(a)(4). *Katz*, 117 F.R.D. at 410; *Harman*, 122 F.R.D. at 529.

With the exception of Anthony Marra, this court finds the plaintiffs to be adequate representatives of the putative class. *Predominance and Superiority.*

Having established that all of the prerequisites of 23(a) have been met, the plaintiffs must show "that the questions of law or fact common to the members of the

class predominate over any questions affecting only individual members; and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Rule 23(b)(3).

UAL challenges the first prong of the test under 23(b)(3), charging that individual issues will predominate the litigation. The court has already determined that common issues exist; it must now ensure that those common issues will predominate the litigation. According to UAL, individual issues will bog down the litigation, because of the alleged unique defenses available against Fry and Dwyer.

In its analysis of the typicality requirement, the court found that the defenses which UAL proposed to assert against Fry and Thomas Dwyer failed to defeat the typicality requirement. The defenses discussed in that analysis do not determine predominance, but rather the ability of the named plaintiffs to represent the class. The court need not revisit that issue.

Predominance is usually decided on the question of liability, "and if the liability issue is common to the class, common questions are held to predominate over individual questions." *Dura–Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 93 (S.D.N. Y.1981). Common questions clearly predominate in this case as to whether UAL, then acting as Allegis, disseminated misleading information, thereby artificially deflating the prices of its securities and violating applicable law. Therefore, this court finds that the requirement of predominance has been met.

Finally, the court finds the class action device to be a superior means of litigating the claims of the class members. The considerations relevant to this finding, as stated in the rule, are:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the

difficulties likely to be encountered in the management of a class action.

The plaintiffs do not appear to be interested in wresting the litigation from the class, and the court is unaware of any other litigation which has been filed concerning the alleged misrepresentation by UAL. Furthermore, securities fraud actions are particularly suited to class action suits, because the claims involved are often too small to be brought in individual lawsuits. *King v. Kansas City Southern Industries, Inc.*, 519 F.2d 20 (7th Cir.1975); *Ridings*, 94 F.R.D. at 150.

*Plaintiffs' claims under the Illinois Consumer Fraud Act.*

UAL's final arguments are an attempt to defeat the plaintiffs' contention that their state law claims should be afforded pendant jurisdiction. The court addressed UAL's arguments as to the common law fraud claims in the context of the commonality requirement. UAL also argues that the plaintiffs' claims brought under the Illinois Consumer Fraud and Deceptive Business Practices Act, 121½ Ill.Rev. Stat., ¶ 261 *et seq.*, cannot be certified, because the act was only intended to protect "Illinois consumers by filling perceived gaps in the protection then afforded such consumers against fraudulent practices by Illinois common law and other statutory remedies." Response, p. 40. This contention is without merit. The terms of the act contain no such limitation. Pursuant to ¶ 262, the act prohibits fraud "in the conduct of any trade of commerce." Moreover, in *Miner v. Gillette Co.*, 87 Ill.2d 7, 56 Ill.Dec. 886, 428 N.E.2d 478 (1981), the Illinois Supreme Court certified a class action suit involving non-Illinois residents brought, in part, under the Illinois Consumer Fraud Act.

## CONCLUSION

Accordingly, for the reasons set forth above, the court will provisionally certify a class consisting of all persons, other than defendant and affiliated persons, who sold common stock of Allegis Corporation or puts in the common stock of Allegis Corpo-

ration during the period of October 29, 1987 through December 8, 1987. The representatives of the class shall consist of all of the plaintiffs named in the complaint, except for Anthony Marra, whom this court did not find to be an adequate representative pursuant to 23(a)(4).