Janet **ZIEMACK**, Kenneth Z. Slater, Ellen Z. Slater, Herbert Eisenstadt, Joseph Meyer, Harvey Meyer, and Brenda Drucker, Plaintiffs,

v.

**CENTEL CORPORATION**, John P. Frazee, Jr., and J. Stephen Vanderwoude, Defendants.

No. 92 C 3551.

United States District Court, N.D. Illinois, Eastern Division.

Sept. 22, 1995.

Michael David Craig, Richard S. Schiffrin, Schiffrin & Craig, Ltd., Buffalo Grove, IL, for Janet Ziemack, Kenneth Z. Slater, Ellen Z. Slater, Herbert Eisenstadt, Joseph Meyer, Harvey Meyer, Brenda Drucker.

Christina M. Tchen, Susan Getzendanner, Matthew Robert Kipp, Skadden, Arps, Slate, Meagher & Flom, Chicago, IL, for John P. Frazee, Jr., J. Stephen Vanderwoude.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

This matter comes before the Court on the Defendants' Motion to Decertify or, Alternatively, to Redefine the Class.[1] For the reasons discussed below, we deny the motion without prejudice on the issue of inadequate representation arising from the presence of class members who sold shares during the class period. We deny the motion with prejudice as to all other grounds.

### I.

This is a securities fraud case filed under Section 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) & 78t(a) (1981), Securities and Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10b–5 (1994), and the Illinois common law. The question presently before the Court is whether the class certified on March 11, 1993 should be decertified or modified. About four months after the filing of this action, regarding the federal claims only, the parties stipulated to a class

---

1. The present motion is the subject of no less than five memoranda, not including the pleadings withdrawn in 1993 at the suggestion of the Court. These memoranda include the original motion and brief, the response, the reply, the supplement based on the New York complaint, and the response to the supplement based on the New York complaint.

consisting of all persons and entities who purchased the common stock of Centel during the period from January 23, 1992 through May 27, 1992, inclusive, and who were damaged, except Centel, its subsidiaries and affiliates, the individual defendants, other officers and directors of Centel, members of the immediate family of each of the individual defendants, any entity in which any defendant has a controlling interest, and the legal representatives, heirs, successors or assigns of any such excluded party....

(Stipulation of September 18, 1992). On January 20, 1993, then Magistrate Judge Bucklo issued a Report and Recommendation that this Court certify the identical class on the common law claims. We adopted her recommendation on March 11, 1993.

This Court previously denied the Defendants' motion to dismiss. *See Ziemack v. Centel,* 856 F.Supp. 430 (N.D.Ill.1994) ("memorandum opinion"). Our prior memorandum opinion sets out most of the background to this action. We proceed directly to the arguments.

## II.

When a claim for relief involves issues of law or fact common to a class of persons, and when the issues center on questions of law applicable in like manner to each member of the class, class relief is "peculiarly appropriate." *See General Telephone Company of the Southwest v. Falcon,* 457 U.S. 147, 155, 102 S.Ct. 2364, 2369, 72 L.Ed.2d 740 (1982); 7A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure §§ 1751–64 (1986 & Supp.1995). Rule 23 of the Federal Rules of Civil Procedure governs the standards for certifying, decertifying, or modifying a class. It is well settled that the party requesting class certification has the burden of showing the four requirements for certification within Rule 23(a) of numerosity, commonality, typicality, and adequate representation. *See General Telephone Co.,* 457 U.S. at 157–58, 102 S.Ct. at 2371. In an action for damages, the movant must also show that common issues predominate over individual ones and that the class action is a superior way to adjudicate the class members' claims. Fed. R.Civ.P. 23(b); *In re Seagate Technology II Securities Litigation,* 843 F.Supp. 1341, 1351–52 (N.D.Cal.1994). The burden of persuasion throughout the litigation remains with the party desiring to maintain certification. *See generally U.S. Parole Commission v. Geraghty,* 445 U.S. 388, 408, 100 S.Ct. 1202, 1214–15, 63 L.Ed.2d 479 (1980); 7B Wright, Miller & Kane, *supra,* § 1790.

The standard of proof required in support of certification is rather liberal and subject to our discretion. *See Patterson v. General Motors Corp.,* 631 F.2d 476, 480 (7th Cir.1980), *cert. denied,* 451 U.S. 914, 101 S.Ct. 1988, 68 L.Ed.2d 304 (1981); *see also Sirota v. Solitron Devices, Inc.,* 673 F.2d 566, 571 (2d Cir.), *cert. denied,* 459 U.S. 838, 103 S.Ct. 86, 74 L.Ed.2d 80 and 459 U.S. 908, 103 S.Ct. 213, 74 L.Ed.2d 170 (1982) ("Class certification motions are not subject to the same standards as motions for dismissal for failure to state a claim or for summary judgment."); *Hewitt v. Joyce Beverages of Wisconsin,* 721 F.2d 625, 627 (7th Cir.1983) (holding appellate review standard on decertification ruling is by abuse of discretion). We do not have " 'any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action.' " *Meiresonne v. Marriott Corp.,* 124 F.R.D. 619, 622 (N.D.Ill.1989) (Shadur, J.) (quoting *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974)). Accordingly, "[s]ometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim, and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification issue." *General Telephone Co.,* 457 U.S. at 160, 102 S.Ct at 2372. In counterpoint to the liberal certification standard, as developments in the class litigation occur, a court remains free to modify or vacate a certification order if it should prove necessary. *General Telephone Co.,* 457 U.S. at 160, 102 S.Ct. at 2372 (citing Fed.R.Civ.P. 23(c)(1)).

The Defendants have challenged the propriety of the certified class on several

grounds. Under Federal Rule of Civil Procedure ("Rule" or "Fed.R.Civ.P.") 23(a)(3), they argue that the named Plaintiffs comprise persons who have claims atypical of the class members. Under Rule 23(b)(3), they argue that common issues of law and fact do not predominate over individual issues. Under Rule 23(a)(4), they argue that the named Plaintiffs are inadequate representatives because the class contains persons who have interests antagonistic to theirs. We treat these contentions in turn.

### A.

The Defendants argue that decertification or modification is proper because the named Plaintiffs do not have claims typical of the class as required under Rule 23(a)(3). Typicality generally requires that the claims of the plaintiffs stand or fall on the same facts as the claims of the putative class members. *See East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403, 97 S.Ct. 1891, 1896, 52 L.Ed.2d 453 (1977). Typicality "does not require that the claims or defenses of the class representatives be identical or perfectly coextensive with the claims or defenses of the members; substantial similarity is satisfactory." *Allen v. Isaac*, 99 F.R.D. 45, 54, *order amended*, 100 F.R.D. 373 (N.D.Ill.1983).

The Defendants say this Court's June 7, 1994 memorandum opinion bifurcated the class period into two subperiods requiring different levels of proof of scienter for the establishment of liability.[2] They interpret our memorandum opinion as implying that the class members must have suffered legal injury, if at all, only during the second subperiod. Since some named Plaintiffs fall into the earlier subperiod and the rest fall into the latter, they argue the named Plaintiffs do not all have claims typical of the class. They state:

> The Court identified in its Memorandum Opinion only one statement for which plaintiffs had adequately pled a fraud on the market. This statement was made on

March 26, 1992. Mem.Op. at 9. Nothing in the Court's Memorandum Opinion suggests that any of statements attributed to defendants before that date are actionable. Accordingly, most of the named class members are not typical of the class because all but two bought their Centel shares before March 26, 1992.

(Def.'s Mot. to Decertify the Class or, in the Alternative, to Redefine It at ¶ 9). As authority, they cite *J.H. Cohn & Co. v. American Appraisal Assoc., Inc.*, a case that held certification properly denied where "on the issue of scienter, a purchaser earlier in the period would face a different proof concerning the defendants' willfulness or recklessness in issuing or omitting to issue material information than a purchaser later in the period." *Cohn*, 628 F.2d 994, 998 (7th Cir. 1980).

The Plaintiffs respond that this Court's June 7, 1994 memorandum opinion denied the Defendants' motion to dismiss in its entirety. They detect no bifurcation of the class period in this Court's mention of the March 26 statement. They call the Defendants' argument "illogical," pointing out that in finding recklessness sufficiently alleged in the Second Amended Complaint, this Court cited paragraphs alleging the Defendants' statements spanning the entire class period. They further argue that *J.H. Cohn & Co. v. American Appraisal Assoc., Inc.* is distinguishable as "[a]t least four judges in this District have rejected *Cohn's* application because the Seventh Circuit did not base its decision on the commonality element *per se*, but on whether the denial of class certification was an extreme abuse of discretion warranting a writ of mandamus." (Class Pl.'s Mem. in Opp'n to Def.'s Mot. to Decertify or, Alternatively, to Redefine the Class at 10). *See In re Bally Mfg. Sec. Litig.*, 141 F.R.D. 262, 267, *order clarified*, 144 F.R.D. 78 (N.D.Ill.1992) (Aspen, J.) (describing the reasoning in *Cohn* as "questionable at best"); *Grossman v. Waste Management, Inc.*, 100 F.R.D. 781, 787 n. 5 (N.D.Ill.1984) (Marshall, J.); *Harman v. LyphoMed, Inc.*, 122 F.R.D.

---

**2.** We treat this argument as falling under the typicality requirement of Rule 23(a)(3) because this is how the Defendants presented it in their motion. We note the Defendants asserted the argument instead under Rule 23(b)(1) in their memorandum in support of the motion. Our discussion easily applies to either section of Rule 23.

522, 526 n. 2 (N.D.Ill.1988) (Hart, J.); *In re VMS Sec. Litig.*, 136 F.R.D. 466, 475 n. 2 (N.D.Ill.1991) (Conlon, J.).

The Plaintiffs have the better side of this argument. This Court finds it surprising that the words of the June 7, 1994 memorandum opinion may have engendered any question about multiple standards for proving scienter. In the Court's memorandum opinion on the motion to dismiss, we addressed whether the Plaintiffs' Second Amended Complaint adequately stated all of the required elements for a claim of securities fraud under Section 10(b) and Rule 10b–5. *See Ziemack*, 856 F.Supp. at 433. One of these required elements is scienter. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 1380–81, 47 L.Ed.2d 668, *reh'g denied*, 425 U.S. 986, 96 S.Ct. 2194, 48 L.Ed.2d 811 (1976). Scienter may take at least three forms—intent, knowledge, or recklessness. *See Rowe v. Maremont Corp.*, 850 F.2d 1226, 1238, *reh'g denied* (7th Cir. 1988). In denying the motion to dismiss, we established the law of the case that the Plaintiffs had sufficiently alleged scienter. *Ziemack*, 856 F.Supp. at 436. Our particular path of reasoning was to determine whether the Plaintiffs adequately alleged recklessness. In concluding the Plaintiffs had sufficiently alleged recklessness, we did not foreclose later proof of the exact nature of the alleged scienter, whether it might be intent, knowledge, *or* recklessness.

 Given the Defendants' misapprehension of our prior ruling, we think it prudent to clarify some points. The Court's mention of the March 26 statement does not foreclose the Plaintiffs from presenting at trial any other alleged statement or any higher standard of scienter to establish securities fraud. When a court rules upon a motion to dismiss, it searches the complaint to determine whether the plaintiff may allege *any* set of facts which might entitle it to relief. *See generally* 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (1990 & Supp.1995). The inquiry may end when the court locates a single set of facts supporting a claim. Others may still exist. Once it locates a claim for relief, a court entertains no obligation to seek out all actionable sets of facts to be extracted from a complaint. In denying the Defendants' motion to dismiss, we did nothing to suggest that the class period encompassed separate standards of proof, different in degree or in kind.

 Even if we did so divide the class period, this would have raised no typicality issue in this case. In general, questions of scienter will not vary over the class period. *Harman*, 122 F.R.D. at 526. When a securities action class plaintiff alleges a common course of conduct spanning a class period, the particular date when he purchased does not vitiate the typicality of his claims. *Katz v. Comdisco*, 117 F.R.D. 403, 410–11 (N.D.Ill. 1987).

The Plaintiffs here allege a common course of conduct manifested as a series of misstatements or omissions to state material facts concerning the auction of the Centel Corporation. The allegations at bar span only four months and involve price inflation of a single class of securities. Even a scheme alleged to have involved multiple funds over a period of three years has been held to be a "common scheme." *E.g.*, *VMS*, 136 F.R.D. at 474. The cases where the plaintiffs' claims were held atypical based on the mix of information available to the market have involved far more compelling facts. *Cf. Issen v. GSC Enterprises, Inc.*, 508 F.Supp. 1298, 1301–02 (class spanned six years and plaintiffs sought to represent persons who purchased shares more than four years after plaintiffs' purchase). For these reasons, even if we accepted the interpretation of our memorandum opinion the Defendants wish us to accept, they have not shown that the claims of any named Plaintiffs are atypical based on any splitting of the class period into different standards of proof.

### B.

 The Defendants also argue that common questions of law or fact do not predominate. *See* Fed.R.Civ.P. 23(b)(3). We reject this argument as well. In order for a plaintiff to maintain class certification, there must be a common nucleus of operative facts applicable to the entire class. *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir.1992),

*cert. denied sub nom. Livaditis v. Rosario,* — U.S. —, 113 S.Ct. 972, 122 L.Ed.2d 127 (1993); *Jaroslawicz v. Safety Kleen Corp.,* 151 F.R.D. 324, 327 (N.D.Ill.1993). Put another way, there must be at least one issue of law or fact that exists which is common to all the class members. *Meiresonne,* 124 F.R.D. at 622. The common issues must predominate over individual ones. Fed.R.Civ.P. 23(b)(3).

The Defendants attempt to establish that the fraud on the market theory adopted by the Supreme Court in *Basic v. Levinson* does not apply, and that therefore the Plaintiffs are not entitled to a presumption of reliance upon the alleged fraudulent statements or omissions of the Defendants. *See Basic,* 485 U.S. 224, 246, 108 S.Ct. 978, 991, 99 L.Ed.2d 194 (1988). They say the market had available a different mix of information at different times during the class period. Accordingly, so the argument goes, individual Plaintiffs will have to prove reliance on individual statements or omissions, of which there are at least three kinds. Some statements or omissions refer to the "value" of the company, some refer to the "goal" of maximizing shareholder value, and some refer to the "process" of the auction. These three kinds of statements might impute three kinds of scienter, each one requiring the Plaintiffs to meet a separate burden of proof. Furthermore, since the value of the shares on the date of the consummation of Centel's sale to Sprint in March 1993 roughly equaled the value of the shares during the class period in early 1992, when the Plaintiffs claim the share price was artificially inflated, the Defendants argue the market could not possibly have been defrauded.

The Plaintiffs respond that the focus of the commonality inquiry is on whether the liability issue is common to the class. The continuing course of wrongful conduct alleged by the Plaintiff should therefore not be broken down into meaningless distinctions. To do so, they say, would do away with all securities fraud class actions because defendants will always claim that class plaintiffs relied on a different mix of information.

■ To rebut the fraud on the market theory, a defendant must show in a particular case that (1) the securities did not trade in a "market," or (2) the plaintiffs decided to trade for reasons wholly distinct from share price activity or the alleged conduct of the Defendants. In effect, a defendant would have to prove that the economic justification for the Supreme Court's adoption of fraud on the market theory—that investors rely on the integrity of share price in an efficient market—does not apply. *See Basic,* 485 U.S. at 247, 108 S.Ct. at 991. We believe that the Defendants have failed to establish that individual issues of reliance will predominate, or even that reliance will exist at all as a disputed issue in this litigation. The Defendants' arguments are imaginative, but unpersuasive.

Neither separate theories of scienter nor a rise in share price long after the end of the class period removes this case from the application of fraud on the market theory. Therefore, the Defendants' contentions do not raise the spectre of individual questions of reliance (and thus lack of commonality) justifying decertification. Here, Centel shares traded in large volume in an impersonal, well-developed market during the class period. Further, the Defendants offer no reason to believe that significant numbers of Plaintiffs traded based only on information distinct from the information which the market integrated into the Centel share price. As the Court in *Basic* stated:

> where materially misleading statements have been disseminated into an impersonal, well-developed market for securities, the reliance of individual plaintiffs on the integrity of the market price may be presumed.... Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b–5 action.

> \*　　\*　　\*　　\*　　\*　　\*

> Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance.

*Basic,* 485 U.S. at 247–48, 108 S.Ct. at 992.

The Defendants propose that different shareholders' dependence on separate theo-

ries of scienter constitutes a reason to reject fraud on the market theory. In fact, different shareholders' dependence on separate theories of scienter could only be an effect of, not a reason for, a rejection of fraud on the market theory. Scienter focuses on a defendant's state of mind. Reasons for rebutting fraud on the market theory focus on market structure or the unusual circumstance of buyers and sellers ignoring share price. *See Harman*, 122 F.R.D. at 525–26 (holding particular exchange where security is traded is immaterial where investors rely on integrity of market price); *see also* Louis Loss & Joel Seligman, Fundamentals of Securities Regulation 1051–57 (1995). Only after such a rebuttal would a court entertain the possibility that separate theories of scienter raise individual questions of reliance.

We note also that we have already disposed of the Defendants' argument that the higher Centel share price in March 1993 precludes the Plaintiffs from claiming they bought shares in a "defrauded market." As we stated in our memorandum opinion, "an increase in stock value subsequent to fraudulent concealment of material information does not disqualify the stockholder from recovering for any loss attributable to the concealment that the defendant had a duty to disclose." *Ziemack*, 856 F.Supp. at 434 (citing *Rand v. Monsanto*, 926 F.2d 596, 597 (7th Cir.1991)). We fail to grasp how one day's share price outside the class period can suggest that the market in question was not reacting quickly to all public information, or that investors were not relying on the integrity of share price. "Full disclosure of adverse information may lower the price, but it does not exclude the security from the market." *Eckstein v. Balcor Film Investors*, 8 F.3d 1121, 1131 (7th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 883, 127 L.Ed.2d 78 (1994). The Defendants have failed to rebut the reliance presumption to challenge the predominance of common issues under Rule 23(b)(1). Accordingly, the Defendants have offered no convincing grounds for concluding that common questions of law or fact do not predominate in this action.

### C.

The Defendants argue that decertification or modification is proper because the named Plaintiffs are inadequate representatives of the class under Rule 23(a)(4). They have presented two theories of how the named Plaintiffs might not adequately represent the class. One theory involves the participation of three named Plaintiffs in a separate lawsuit. The other theory involves potentially antagonistic interests among class members depending on whether and when they sold Centel shares during the class period.

### 1.

We first treat the argument that the filing of a separate action by some of the named Plaintiffs establishes inadequate representation under Rule 23(a)(4). The Defendants have presented to the Court a class action complaint filed by three of the fourteen class members in the Supreme Court of New York. They say the New York complaint shows that those three have an interest in establishing facts beneficial to the Defendants and detrimental to members of the class in this action. The New York complaint charges the negligence of the investment bankers who advised Defendant Centel about the company sale at issue in this case. Specifically, in the New York complaint filed in January 1995, Plaintiffs Joseph Meyer, Irving Kas, and Herbert Eisenstadt allege that investment bankers Goldman, Sachs & Co. and Morgan Stanley & Co. negligently advised non-management directors of Centel about the progress of the 1992 auction for Centel. That complaint states:

Among other things, defendants [Goldman Sachs and Morgan Stanley] negligently advised the non-management directors that: (1) it was an opportune time for Centel to explore strategic alternatives to maximize shareholder value; and (2) in their opinion, whether in a sale of the entire company to a single purchaser or a piecemeal sale of Centel's properties (the "break-up scenario"), the auction of the Company would yield values for Centel's shareholders in the range of $45–$55 per share....

In addition, the investment banker defendants negligently advised Centel's non-

management directors during the auction process that, among other things: (a) the auction was progressing well; (b) interest in Centel and its properties was "high;" and (c) both public and private expressions of non-interest or limited interest by prospective bidders were merely negotiating tactics and were not to be taken at face value.

(New York Compl. at ¶¶ 4–5).

In support of the argument that these three named Plaintiffs are inadequate class representatives, the Defendants contrast certain paragraphs in the New York complaint with certain paragraphs in the Second Amended Complaint at bar. They say the different complaints put forth inconsistent theories of what the investment bankers advised to the Centel board of directors at a March 26, 1992 meeting. According to the Defendants, in the Second Amended Complaint, the Plaintiffs allege that the investment bankers told the Centel board at that meeting the auction was progressing poorly (not well). The investment bankers allegedly told board members that "the Regional Bell Operating Companies and large independent telephone companies were not represented as the investment bankers originally thought they would be." (Second Am.Compl. at ¶ 78). In the New York complaint, the Defendants say the Plaintiffs put forth an inconsistent theory, one in which the investment bankers told Centel non-management directors the auction was progressing well (not poorly) when in fact it was not. They argue that this inconsistency in pleading hurdles that allowed by Rule 8(e) and may even constitute an admission in the present litigation that the investment bankers' advice negated the Defendants' scienter. Consequently, they argue, these named Plaintiffs have interests in proving facts adverse to the class. The Defendants also point out that the same counsel prosecuting the present action are prosecuting the New York action.[3]

■ The Plaintiffs respond that the Defendants have mischaracterized the nature of the New York action. They say the Plaintiffs' participation in each of the two actions is not only consistent, but also evidences the New York Plaintiffs' zealousness in obtaining relief for the class members to the greatest extent possible. In New York, a shareholder may prevail in an action directly against an investment bank for negligent sale or merger advice given to a committee of the board of directors. *See Schneider v. Lazard Freres & Co.,* 159 A.D.2d 291, 552 N.Y.S.2d 571, 574 (N.Y.App.1990). The shareholders do not sue derivatively on behalf of the corporation, but rather on their own behalf. *Id.* Therefore, the Plaintiffs argue, they are doing nothing to protect the interests of the Centel Corporation by suing the investment bankers.

Further, the Plaintiffs contend the Defendants have understated how the Plaintiffs have distinguished in the two complaints the alleged states of mind of the management directors versus the non-management directors. In this action, the Plaintiffs allege fraudulent conduct of management directors who possessed undisclosed material information unknown to non-management directors. In the New York action, the Plaintiffs allege negligent conduct by the investment bankers who kept non-management directors in the dark about the true progress of the company sale. Consequently, the Plaintiffs assert that facts presented by the investment bankers at a meeting of the full board of directors had different significance to different directors: to the management directors, these facts reinforced their fraudulent scienter and to the non-management directors, these facts, as presented, constituted negligent advice.

To show that management directors were well informed of the auction's progress and non-management directors were not, the Plaintiffs point to evidence suggesting the investment bankers were in continual contact with the management directors during the class period, and communicated only sparingly with the non-management directors. As their fallback, the Plaintiffs say that to the extent the pleadings are inconsistent, this is allowed by Rule 8(e) and does not signal any

---

**3.** We wonder if the Defendants mean to imply to the Court the presence of a professional responsi-bility issue.

antagonism among class Plaintiffs. Further, as their second fallback, they contend that even accepting all of the Defendants' arguments, this Court may remedy any Rule 23(a)(4) problem by removing the three New York Plaintiffs from the present action.

We express reluctance at the outset to find that the recent New York action against the investment bankers reflects any antagonism as understood within Rule 23(a)(4). This case is far advanced. We note that this civil action is now three and one half years old, and that the Defendants were required to file an answer to the second amended complaint only one year ago. We also note that discovery rested in a virtual holding pattern prior to Magistrate Judge Keyes' thoughtful and thorough disposition of some extremely complicated work product and attorney client privilege issues. Hidden facts have probably only recently come to light. This Court cannot expect early clairvoyance by plaintiffs' attorneys of all potential causes of action arising from activities of corporate insiders during the sale of a company.

We hold that the Plaintiffs have adequately shown that there is no adversity by reason of the New York action. Where a subset of the named plaintiffs in a class action files a separate action against different defendants, and where the establishment of liability of the defendants in one action would not prejudice the establishment of liability of the defendants in the other action, that subset of named plaintiffs may still adequately represent the class. Put another way, branching off to pursue relief in a second forum does not necessarily place the more adventuresome class champion at odds with the less adventuresome ones.

The case relied on by the Defendants is distinguishable. In *Koenig v. Benson*, the court found adversity where some of the class plaintiffs filed a derivative suit on behalf of the same corporation they were suing for securities fraud. *See Koenig*, 117 F.R.D. 330, 334–35 (E.D.N.Y.1987). The corporation was operating under a Chapter 11 reorganization plan. Consequently, any recovery in the derivative suit would go primarily to repay or secure debt to "creditors and bondholders who would have priority in receiving any recovery...." *Id.* at 335. The court distinguished the situation where a separate action seeks "to do no more than fill the coffers of the company so that any class action recovery might be meaningful." *Id.* at 334 (citation and internal alterations and quotations omitted).

The present case is just like the one the *Koenig* court distinguished. In this case, a finding of negligence against the investment bankers in the New York action would not be inconsistent with a finding of securities fraud against the management directors. We think it is possible for the New York plaintiffs to argue both the negligence of the bankers in their dealings with non-management directors and the material misstatements or omissions of management directors in their public and internal communications. The Plaintiffs can conceivably prove a set of facts establishing liability in both cases.

Furthermore, the Plaintiffs are not suing Peter to pay Paul. Recovery on the negligence claim in the New York action would go directly to the shareholders, not to the corporation or its creditors and bondholders because the New York action is not a derivative suit filed on behalf of a company in Chapter 11 reorganization. Arguing both causes still leaves room for a plaintiff to adequately represent the class in each action.

### 2.

The second ground the Defendants present to suggest inadequate representation under Rule 23(a)(4) is more convincing. The Defendants borrow this rationale from a scholarly and exhaustive opinion by Judge Walker in the Northern District of California, *In re Seagate II Securities Litig.*, 843 F.Supp. 1341 (N.D.Cal.1994). The Defendants argue that the class definition encompasses at least two distinct groups: purchasers of Centel shares who retained them throughout the class period and purchasers of Centel shares who also sold them during the class period. The Defendants call these groups the "retention" group and the "in-out" group. The merging of these groups within a single class is problematic, the Defendants say, when one considers the Plaintiffs' theory of the case.

The Plaintiffs allege that during the class period the share price was artificially inflated over what it should have been had material non-public information been in the hands of investors. The Plaintiffs do not specify whether they will claim this inflation level was fixed or fluctuating. If the Plaintiffs claim the artificial inflation level was a fixed amount, then the Defendants say class purchasers who also sold all their purchased Centel shares during the class period could prove no damages and thus would have no standing. Alternatively, if the Plaintiffs claim the artificial inflation level fluctuated, then as to any particular day of the class period, an in-out class member who sold that day would have an incentive to minimize the level of artificial inflation asserted by the class. To recover a greater amount under the out of pocket damages rule, that class member would overemphasize the degree of liability arising from some statements and omissions and underemphasize the degree of liability arising from other statements and omissions. By contrast, retention Plaintiffs have an incentive to establish the greatest degree of liability possible in every statement or omission of the class period. Therefore, the class as currently defined contains in-out plaintiffs who have interests antagonistic both to retention plaintiffs and possibly to each other.[4]

The Plaintiffs respond that the interests of the in-out plaintiffs would diverge if at all only in the degree of damages sought. They cite several cases for the proposition that establishment of liability is of primary importance and establishment of damages is only secondary. *See e.g., Bally,* 141 F.R.D. 262, 270; *Harman,* 122 F.R.D. at 527. They argue that the named Plaintiffs here are all adequate representatives of the class because of their uniform interest in establishing liability. Further, they say that Judge Walker's analysis in *Seagate* is distinguishable for several reasons. Before the court in *Seagate* was not only a class certification issue, but also a summary judgment motion, and therefore the court was contemporaneously considering questions on the merits. The alleged fraud in *Seagate* involved a series of

partially curative disclosures causing the share price to step down gradually, while here, the alleged fraud involves a one-time fullly curative disclosure causing the share price to descend in one plunge. Finally, as the Defendants concede, *Seagate* runs counter to decisions in this District.

We think Judge Walker's detailed historical and economic analysis in *Seagate* is powerful. In that opinion, he traces the historical progress and recent trends in securities law, class certification law, and efficient markets theory to arrive at his conclusion. He determined that courts everywhere have unduly glossed over significant adversity of interests in certifying securities fraud class actions. We follow Judge Walker's analysis and add a few clarifications of our own.

Before we get to that analysis, we must take note that the plaintiffs in *Seagate* alleged an artificial price level inflation ("spread") that fluctuated. Here, the Plaintiffs might be asserting either a fixed spread or a fluctuating spread. They have not told us. As a preliminary matter, then, we address the Defendant's argument that in-out Plaintiffs lack standing in a fixed spread scenario.

We hold that it is premature to suggest in-out plaintiffs would have no standing. Under the fixed spread scenario, the Defendants suggest that those who sold all of the shares they bought would have recouped all losses incurred by reason of any fraudulent conduct because courts use an out of pocket measure of damages. However, the Defendants overlook that share price inflation is only one out of pocket measure of damages. An individual plaintiff might be capable of proving a different measure of damages notwithstanding recoupment of share price. For example, in reliance on the increase in Centel share price at the start of the class period, some Plaintiffs might have incurred transaction costs in shifting an investment portfolio, such as significant brokerage fees or redemption penalties. *See generally* Loss & Seligman, *supra* at 1062–63 ("Consequential damages are recoverable on top of everything else—

---

**4.** Additionally, the Plaintiffs have never indicated which, if any, of the named Plaintiffs are in-out

class members who sold Centel shares during the class period.

for example, the plaintiff's cost of investigating the transaction before he or she entered into it."); *Deutschman v. Beneficial Corp.,* 841 F.2d 502, 506 (3d Cir.1988), *cert. denied,* 490 U.S. 1114, 109 S.Ct. 3176, 104 L.Ed.2d 1037 (1989) ("The only standing limitation recognized by the Supreme Court with respect to section 10(b) damage actions is the requirement that the plaintiff be a purchaser or seller of a security."). Even if transaction costs did not constitute actionable injuries, whether certain class members sustained any damages at all is not a question for us to decide at the class certification stage. *See Grossman,* 100 F.R.D. at 784.

Even though we reject the claim that in-out class members in a fixed inflation level scenario have adverse interests to the class because of a claimed lack of standing, we do agree that in-out class members might have adverse interests in a fluctuating spread scenario. In *Seagate,* Judge Walker explained the adverse interests involved by first setting forth an equation representing the measure of damages a successful securities plaintiff may expect to win under an out of pocket theory:

$$D = P * (PL_p - VL_p) - S * (PL_s - VL_s),$$

where D represents damages to the individual; P represents the number of securities purchased in the class period; $PL_p$ represents the price read from the price line at the time of purchase; $VL_p$ represents the value taken from the value line at the time of purchase; S represents the number of securities sold in the period, with the added condition that the maximum value of S is equal to P; $PL_s$ and $VL_s$ represent, respectively, the amounts taken from the price line and value line at the point of sale.

*Seagate,* 843 F.Supp. at 1348–49.[5] The price line is rather simple: it is the time graph of the share prices of the particular security during the class period. The value line is only slightly more complicated: it is the time graph of hypothetical share prices during the class period if the allegedly fraudulent conduct had not occurred. The fraud on the market theory approved of in *Basic* teaches us that well developed securities markets react with equal vigor to both truthful and deceptive public information. Therefore, either distribution of materially deceptive information or withholding of materially truthful information will cause the price and value of a security to diverge. The out of pocket measure of damages teaches us that the spread of this divergence, multiplied by the number of transactions involved, establishes a successful plaintiff's damages. *See Seagate,* 843 F.Supp. at 1349. The formula above merely encapsulates the combination of these two legal principles.

In the formula above, a retention plaintiff would have sold zero shares. Therefore, S = 0, and damages consist only of the product of P and the spread at the time of purchase, $(PL_p - VL_p)$. All retention plaintiffs have an interest in maximizing a fact-finder's decision of the amount of this spread on each day of the class period. Therefore, in a fluctuating spread scenario, retention plaintiffs will attempt to maximize the liability producing nature (the materiality) of *every* allegedly material misstatement or omission. The goal is to make the value line seem *as far below* the price line as possible during the entire period.

On the other hand, an in-out plaintiff would have sold S shares. All in-out plaintiffs have an interest in minimizing the product of S and the spread at the time of sale, $(PL_s - VL_s)$. All in-out plaintiffs have an interest in minimizing a factfinder's decision of the amount of this spread at the time of their sale transaction. Therefore, in a fluctuating spread scenario, in-out plaintiffs will attempt to minimize the liability producing nature (the materiality) of the allegedly material misstatements or omissions affecting *only* the time of their sale transaction, and to maximize all others. The goal is to present the value line to appear *as close* to the price line as possible at the discrete times of their sale transactions.

---

5. Based on our discussion of damages above, we might also add to Judge Walker's damage formula a term TC, representing the costs of the transactions of purchase and sale. The result would be:

$$D = P * (PL_p - VL_p) - S * (PL_s - VL_s) + TC$$

The choice of which statements or omissions to emphasize to a trier of fact is a key element of trial strategy. When sub-groups of class members have conflicting positions on a key element of trial strategy for establishing liability, the sub-groups have interests adverse to each other. Here, the in-out Plaintiffs' interests are adverse to the retention Plaintiffs' interests in the fluctuating inflation level scenario.

The in-out Plaintiffs may also have interests adverse to each other. The class period comprises approximately eighty trading days. Within those eighty trading days were millions of Centel transactions. Each instant a transaction occurred (the date, hour, minute, and second) in the extreme case constitutes a potentially distinct set of facts governing the value of the spread at the time of a sale. As a practical matter, we do not know how many sets of trial strategy to which the facts of this case may give birth. We further note that the Plaintiffs have not indicated a commitment to either the fixed or the fluctuating inflation level theory.

The Plaintiffs' cases are unpersuasive. We believe the conflict is one involving the establishment of liability, not only the establishment of damage amounts. A district court in the Sixth Circuit disposed of similar attempts by putative class plaintiffs to defuse the implications of Judge Walker's analysis. *See Ballan v. Upjohn Co.*, 159 F.R.D. 473, 484 (W.D.Mich.1994). In *Ballan*, the plaintiff argued that *Seagate* was an aberration, and offered some opinions from courts declining to follow it. *Id.* That court ruled that "[n]one of the cases cited by plaintiff have [sic] refuted the arguments of *Seagate II* with the intellectual rigor demonstrated by Judge Walker." *Id.* We, too, find that not one of the cases cited by the Plaintiffs addresses head on Judge Walker's reasoning, much less undermines it.

Judge Walker was pessimistic over the possibility that subclassification might remedy the adversity of the interests.[6] *Seagate*,

843 F.Supp. at 1364. He reasoned that the different incentives at producing different spreads might fragment subclasses beyond the reach of compliance with the numerosity and manageability requirements of Rule 23. He concluded that an evidentiary hearing would go far toward resolving the question of how much adversity there really may be, and how much is tolerable or inevitable in a class action. Ultimately, the parties declined the invitation to hold the hearing, and instead, the plaintiff stipulated to a class containing only retention plaintiffs. *In re Seagate Technology II Securities Litigation*, 156 F.R.D. 229, 231 (N.D.Cal.1994).

After giving considerable thought to the issue, this Court has concluded it is not yet fully informed of whether and to what extent the class should be modified to exorcise potentially inadequate representation under a fluctuating spread theory. Several possible courses of action are apparent. First, the parties may stipulate that the Plaintiffs will stand behind only a fixed inflation level theory, thereby rendering moot the question of in-out Plaintiffs' adverse interests. This has the added appeal of simplicity. Second, the Court may establish a single in-out Plaintiff subclass if that subclass stipulates to limiting itself to emphasizing or de-emphasizing only a single statement or omission giving rise to a fluctuating artificial level of share price inflation. Likewise, further subdivision of the class period may necessitate further subclassification. Finally, the Court may include only retention Plaintiffs in this action, without prejudice to the rights of in-out Plaintiffs to institute separate actions in their individual capacities. At this stage in the litigation, this is not an attractive option. We also recognize that any subclasses would have to satisfy all of the prerequisites of Rule 23.

To address these questions, we invite the parties to file a joint status report within fourteen days from the issuance of this memorandum opinion. The parties' report should address any agreement on the possible stipu-

---

**6.** He also treated another intriguing source of potential adversity, but we will not address it absent invitation by the parties to do so. This involves the clash of equity holders versus non-holders. In principle, persons suing a company who hold shares of that company might have an incentive to moderate the zealousness of litigation efforts. A non-holder of equity would not feel so constrained.

lation of a theory of liability, subclassification of in-out Plaintiffs, or exclusion of in-out Plaintiffs. If the joint status report states that the parties have reached no agreement, we may set a briefing schedule on the issue.

### CONCLUSION

For the foregoing reasons, the motion to decertify or modify the class is denied with prejudice with one exception. As to questions raised on the potential adversity of interests of in-out Plaintiffs, the motion is denied without prejudice. The Court invites the parties to submit a joint status report within fourteen days.